UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
:
ASSITALIA LE ASSICURAZIONI :
D'ITALIA S.p.A. and ASSICURAZIONI :
GENERALI S.p.A. as Subrogees of : <u>MEMORANDUM & ORDER</u>
ALITALIA LINEE AEREE ITALIANE :
S.p.A., AAR PARTS TRADING, INC. and : 06-cv-6423 (DLI)(JMA)
NORLEASE, INC., :
:
               Plaintiffs, :
:
               -against- :
:
NIPPON CARGO AIRLINES CO., LTD. :
and WORLD WIDE FREIGHT :
SERVICES, INC., :
:
             Defendants. :
-----------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

      Plaintiffs, Assitalia Le Assicurazioni D'Italia S.p.A. ("Assitalia") and Assicurazioni Generali S.p.A. ("Generali") as subrogees of Alitalia Linee Aeree Italiane S.p.A. ("Alitalia"), AAR Parts Trading, Inc., and Norlease, Inc., have brought this insurance subrogation claim for property damage against defendants, Nippon Cargo Airlines Co., Ltd. ("NCA") and World Wide Flight Services, Inc. ("WFS"). Plaintiffs allege that defendants damaged an aircraft engine leased by Alitalia while moving it in a warehouse at John F. Kennedy Airport ("JFK") on October 26, 2004. Defendants have moved for summary judgment under Fed. R. of Civ. P. 56, claiming that the parties' IATA Standard Ground Handling Agreement ("SGHA") precludes liability. Plaintiffs contend that the SGHA does not apply to

the incident at hand. Alternatively, plaintiffs assert their right to arbitration under the SGHA if the court finds that the SGHA applies. For the reasons set forth below, the court finds that the SGHA applies, and plaintiffs have properly asserted their right to arbitrate. As such, these proceedings are stayed pending the outcome of arbitration.

I. Background

This insurance subrogation action arises out of the damage to an aircraft engine leased by Alitalia. The damage occurred while WFS was moving the engine in NCA's warehouse at JFK on October 26, 2004. Alitalia is an Italian International Airline with operations at JFK. NCA provides ground handling services at JFK, which includes the loading and off-loading of aircraft cargo as well as providing temporary storage for the cargo. In October 2004, NCA provided such ground handling services to Alitalia pursuant to the SGHA, which was "effective from: August 01, 2002." (Defs.' Ex. A at § 1.1 of Annex B.) On September 17, 2004, Alitalia and NCA agreed that the SGHA "shall continue in force from August 1, 2004 until July 31, 2007 . . . ." (Defs.' Ex. A at § 11.1 of Annex B.) NCA entered into a separate contract with WFS to perform those services for Alitalia at JFK. (Compl. at ¶ 9; Defs.' 56.1 Statement at ¶ 9.)

The SGHA sets forth the services to be provided, such as providing or arranging: (1) suitable warehouse and handling facilities for general cargo, specialized shipments, and specialized cargo products; (2) storage of cargo for a period to be mutually agreed; and (3) handling services for general cargo,

2

specialized shipments, and specialized cargo products. (Defs.' Ex. A at §§ 5.1.1, 5.1.3 of Annex A; § 1.1.1 of Annex B.) Additionally, the SGHA provides that it will cover services not specifically listed in the SGHA. (Defs.' Ex. A at § 1.1 of the Main Agreement ("It is not considered necessary or possible to specify every detail of the services it being generally understood what such services comprise and the standards to be attained in their performance.").) With respect to such services, the SGHA states: "As far as possible, [NCA] will, upon request, provide to [Alitalia] any additional services. Such services may be governed by special conditions to be agreed between the Parties." (Defs.' Ex. A at § 1.7 of the Main Agreement.; *see also* Defs.' Ex. A at § 2.1 of Annex B ("All services not included in Paragraph 1 of this Annex shall be charged for at current local rates as mutually agreed and payable to [NCA].").)

The SGHA includes an arbitration provision, which requires that "[a]ny dispute or claim concerning the scope, meaning, construction or effect of [the SGHA] or arising therefrom shall be referred to and finally settled by arbitration . . . ." (Defs.' Ex. A at § 9.1 of the Main Agreement.)

At about the end of 2002 or beginning of 2003, Erminio Amanzi, Alitalia's maintenance department supervisor at JFK, asked Robert Caton, NCA's manager of customer airlines at JFK, to temporarily store Alitalia's engines in the NCA warehouse that housed other Alitalia cargo. (Amanzi Dep. at 38:13-40:13, Pls.' 56.1 Statement at ¶ 5.) Amanzi and Caton agreed that NCA would store each engine for

3

one thousand dollars per month. (Amanzi Dep. at 40:3-7; Pls.' 56.1 Statement at ¶ 8.)

On the weekend of October 23, 2004, Alitalia's maintenance department delivered three aircraft engines to store at NCA's warehouse. (Pls.' 56.1 Statement at ¶ 23.) It delivered two of the engines on air transportation stands and one engine on a warehouse storage stand. (Defs.' 56.1 Statement at ¶ 24.) The warehouse storage stand is approximately ten inches higher than the air transportation stand. (Defs.' 56.1 Statement at ¶ 27.) On October 26, 2004, WFS damaged the engine that Assitalia delivered on the warehouse storage stand. (Defs.' 56.1 Statement at ¶ 16.) The damage occurred when WFS attempted to move it on the stand into the Elevated Traversing Vehicle ("ETV") storage system. (Defs.' 56.1 Statement at ¶ 19.) The height of the warehouse storage stand caused a pipe that was on top of the engine to strike the ETV system. (*Id.*)

Alitalia's insurance policy with plaintiffs covered the damage. (Compl. at ¶¶ 12-13.) Pursuant to that policy, plaintiffs paid Alitalia $190,747.75, the cost of the damage to the engine. (Compl. at ¶¶ 15-16.) Plaintiff then filed this action to recover that amount from defendants. (Compl. at ¶¶ 18.) Plaintiffs seek recovery under claims for negligence, breach of contract, and bailment. In moving for summary judgment, defendants argue that the "Liability and Indemnity" provisions of the SGHA preclude such claims. Under those provisions, plaintiffs may only recover for damages "arising from an act or omission of [NCA] in the performance of this Agreement . . . done with intent to cause damage . . . or recklessly and with the

4

knowledge that damage . . . will probably result." (Defs.' Ex. A at § 8.1 of the Main Agreement.) According to defendants, the damage was, at most, the result of ordinary negligence.

Plaintiffs contend that the "Liability and Indemnity" provisions do not apply because defendant did not handle the damaged engine under the SGHA. Instead, plaintiffs argue that Amanzi and Caton formed a separate verbal agreement to handle that engine. If the court finds that the SGHA does apply, plaintiffs argue that the court should allow the parties to arbitrate the claims pursuant to the arbitration clause of the SGHA.

II. Discussion

    a. Legal Standards

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). The nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

b. The Standard Ground Handling Agreement Applies.

When a contract's language is unambiguous, the court is "required to give effect to the contract as written." *Aon Financial Products, Inc. v. Societe General*, 476 F.3d 90, 96 (2d Cir. 2007) (*quoting K. Bell & Associates, Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). Here, the plain language of the SGHA encompasses NCA's storing and handling of the damaged engine. Sections 5.1.1 and 5.1.3 of Annex A of the SGHA lists the services NCA shall provide, which includes providing or arranging "suitable warehouse and handling facilities . . . and services for": (1) general cargo; (2) special shipments; and (3) specialized cargo products. (Defs.' Ex. A at §§ 5.1.1, 5.1.3 of Annex A, § 1.1.1 of Annex B.) The SGHA also governs the "stor[age of] cargo for a period to be mutually agreed." (Defs.' Ex. A at § 5.1.1(c), § 1.1.1 of Annex B.) According to the SGHA's "Definitions and Terminology" Section, "special shipments means, for example, . . . valuables,

6

vulnerable cargo, . . . etc." (Defs.' Ex. A.) This definition of "special shipments" is broad enough to cover the damaged engine. Therefore, the SGHA covers the handling and storage of the damaged engine.

Although the SGHA does not specifically mention aircraft engines, the agreement does explain that "[i]t is not considered necessary or possible to specify every detail of the services . . . ." (Defs.' Ex. A at § 1.1 of the Main Agreement.) Furthermore, to the extent that these provisions do not encompass the storage and handling of the damaged engine, Article 1, Section 7 of the SGHA Main Agreement certainly would. That provision, titled "Additional Services," provides: "As far as possible, [NCA] will, upon request, provide to [Alitalia] any additional services. Such services may be governed by special conditions to be agreed between the Parties." (Defs.' Ex A.) Consistent with this provision, Annex B of the SGHA explains that, if NCA provides services to Alitalia not explicitly listed in the agreement, such services "shall be charged for at the current local rates as mutually agreed and payable to [NCA]." (Defs.' Ex. A at § 2.1 of Annex B.) NCA's handling and storage of the damaged engine also falls within these broad provisions for additional services.

The evidence also shows that NCA stored the damaged engine pursuant to the SGHA. Caton testified that he stored the engine, at Amanzi's request, pursuant to the SGHA. (Caton Dep. at 23:4-24:21.) No witness has contradicted this statement. In fact, Amanzi, the only witness to provide a sworn statement for plaintiffs, testified that he was unaware of the SGHA at the time he requested the

7

services for the engine. (Amanzi Dep. at 14:20-16:7 (explaining that he "absolutely" did not know that the SGHA existed while he worked at JFK).) As such, he was in no position to know whether the services he requested fell under the SGHA. Furthermore, Amanzi conceded that NCA regularly handled aircraft engines for Alitalia. According to Amanzi, NCA regularly loaded and offloaded "material" from Alitalia's aircraft, and NCA stored such cargo in its warehouse until a designated agent picked up the cargo or NCA loaded it onto another Alitalia aircraft. (Amanzi Dep. at 19:14-20:14; 21:5-20.) Amanzi admitted that such "usual material" included aircraft engines. (Amanzi Dep. Ex. F at 24:11-17.) In sum, the plain language of the SGHA as well the testimony from the employees of NCA and Alitalia shows that NCA stored the engine pursuant to the SGHA.

Plaintiffs argue that they "cannot be held to an agreement [(the SGHA)] that its representative, Mr. Amanzi, had no knowledge about, was not aware of the terms of the contract and had no involvement in the negotiations of the contract." (Opp'n at 4.) Plaintiffs cite no authority for this assertion, and the court is unaware of any New York law that prohibits such imputation of knowledge from the principal to the agent in cases against the principal. Indeed, "[m]ost codifications of agency law state that principal and agent are each deemed to have notice of all of which the other has notice[, and such notice] . . . shall be operative . . . as against the principal." Restatement (Third) of Agency § 5.03 cmt. g. (2009); *see also Bullmore v. Ernst & Young Cayman Islands*, 20 Misc. 2d 667, 675 (N.Y. Sup. Ct. 2008) (citing Restatement (Third) of Agency § 5.03 cmt. b. ("Additionally,

8

imputation encourages a principal to develop effective procedures for the transmission of material facts . . . .")).

In *Powers v. Professional Servs. Inc.*, 107 F. Supp. 26 166, 169 (N.D.N.Y. 2000), a federal court rejected plaintiffs' argument in an analogous context. In *Powers*, the court addressed § 1692c(a)(2) of the Fair Debt Collection Practices Act "FDCPA"), which prohibits a debt collector from communicating with a consumer if the debt collector knows that the consumer is represented by counsel with respect to that debt. *See id.* at 168. The defendant creditor knew that the plaintiff was represented by counsel, but when it turned over the plaintiff's file to its debt collector, it failed to convey plaintiff's legal representation. *See id.* The court imputed the creditor's knowledge of the plaintiff's legal representation to its debt collector, noting that such a failure to disclose "would utterly eviscerate the protections afforded debtors by the FDCPA." *Id.* Along the same lines, plaintiffs may not circumvent their obligations under the SGHA by failing to inform its relevant agents of such obligations.

Plaintiffs also argue that Amanzi's request to store the engine at issue must be viewed as a separate contract from the SGHA because "Alitalia's maintenance department and Alitalia's cargo department were two separate entities," and Amanzi was employed by the maintenance department. (Opp'n at 3.) This argument rests on the assumption that there is some distinction between these departments that renders the SGHA binding only on the cargo department, and therefore, any request by the maintenance department for services from defendants

9

must be viewed as a separate agreement. According to plaintiffs, this distinction "is evidenced by the fact that someone from the cargo department signed the SGHA. There was no representative from the maintenance department that signed the SGHA." (*Id.*) This argument lacks merit.

The evidence shows that the SGHA binds Alitalia as a corporate entity: "Alitalia Linee Aeree Italiane S.p.A.," is the signatory of the SGHA. (Defs.' Ex. A.) Nothing in the SGHA indicates that it binds only Alitalia's cargo department or that it excludes the maintenance department. Furthermore, NCA issued the invoices for storing the engine to "Alitalia Airlines," and "Alitalia Airlines" paid these invoices. (Defs.' Ex. G.) There is also no evidence showing that Alitalia's maintenance department has a separate legal existence apart from Alitalia Linee Aeree Italiane S.p.A. In sum, the SGHA applies to the damage that the engine sustained on October 26, 2004.

    c. Plaintiffs Have Not Waived Their Right to Arbitration.

Plaintiffs contend that

> should the Court determine that the SGHA applies to the subject engine, it is respectfully submitted that the Court should not make any further determination as to the allegations contained in the Defendants' Motion for Summary Judgment, since the Plaintiffs would then be entitled to proceed with their claims against the Defendants at an arbitration proceeding, pursuant to Article 9 of the SGHA.

(Opp'n at 6.) Defendants oppose this request, arguing that plaintiffs have waived their right to arbitration. (Reply at 6.) The court finds that plaintiffs did not waive their right to arbitration.

10

"[T]here is a strong presumption in favor of arbitration[, and] waiver of the right to arbitration is not to be lightly inferred." *Coca-Cola Bottling Co. v. Soft Drink and Brewery Workers Union Local 812*, 242 F.3d 52, 57 (2d Cir. 2001) (internal quotation marks omitted.) "An inquiry into whether an arbitration right has been waived is fact specific and not susceptible to bright line [*sic*] rules." *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993). "The key to a waiver analysis is prejudice." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002). There can be no waiver unless the party opposing arbitration demonstrates prejudice. *See Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985); *Sweater Bee By Banff, Ltd., v. Manhattan Indus., Inc.*, 754 F.2d 457, 466 (2d Cir. 1985) ("Finally, the party seeking such a finding—that his opponent has waived a conceded right to arbitration—has a 'heavy burden' . . .").

The Second Circuit has recognized two types of prejudice for finding waiver: substantive prejudice and prejudice due to excessive cost and time delay. *Thyssen*, 310 F.3d at 105. "Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Kramer v. Hammond,* 943 F.2d 176, 179 (2d Cir.1991).

Defendants have not explained how permitting arbitration would prejudice them at this juncture. Instead, their opposition to arbitration relies entirely on a

single conclusory statement: "Plaintiffs' assertion that if the SGHA applies they are free to proceed to arbitration pursuant to Article 9 of the SGHA is wrong because they have waived that option by commencing this action and forcing NCA to conduct discovery and litigate these issues." (Reply at 6 (citing *Tokio Marine & Fire Ins. Co., Ltd. v. MV Saffron Trader*, 257 F. Supp. 2d 651, 656 (S.D.N.Y. 2003).) As an initial matter, this assertion is at odds with Second Circuit precedent, which establishes that a party does not waive its right to arbitrate merely by commencing a lawsuit. *See Louis Dreyfus Negoce S.A., v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir. 2001) (rejecting the plaintiff's argument that the defendant "waived its right to arbitrate by first bringing suit in London"). Furthermore, simply having to "conduct discovery and litigate issues," does not establish prejudice. Defendants must present evidence that they face excessive costs as a result. *Thyssen*, 310 F.3d at 105 ("Absent evidence of excessive cost, the presumption in favor of arbitration cannot be overcome merely on the basis of the length of the delay."). Defendants have not done this. Nor have they demonstrated that arbitration will subject them to substantive prejudice. As such, defendants have not met their "heavy burden" of showing that plaintiffs have waived their right to arbitration. *Sweater Bee*, 754 F.2d at 466. This failure provides an independent basis for granting plaintiffs' request for arbitration.

Additionally, the circumstances here do not overcome the "strong presumption in favor of arbitration." *Thyssen*, 310 F.3d at 104. First, granting arbitration will not cause substantive prejudice as there is no indication that

12

plaintiffs will seek to relitigate substantive issues the court has already decided against them. In fact, at this stage, the only issue that the court has decided against plaintiffs is that the SGHA applies to the damaged engine. Plaintiffs have already indicated that they will not seek to relitigate this determination through arbitration. (*See* Opp'n at 6 ("should the Court determine that the SGHA applies to the subject engine, it is respectfully submitted that the Court should not make any *further* determination as to the allegations contained in the Defendants' Motion for Summary Judgment, since the Plaintiffs would then be entitled to proceed with their claims against the Defendants at an arbitration proceeding") (emphasis added).)

Second, defendants cannot show that arbitration would subject them to excessive cost and delay. The Second Circuit has declined to find waiver in cases where there were greater delays and litigation costs than in this case. *See, e.g.*, *Sweater Bee*, 754 F.2d at 459-60 (finding arbitration proper where the party asserting the right had moved to dismiss the complaint on grounds that went to the merits, moved for reargument when the court denied the that motion, engaged in discovery and motion practice concerning discovery, and asserted the right two years after the complaint was filed); *see also Acquaire, et al., v. Canada Dry Bottling, et al.*, 906 F. Supp. 819, 829-30 (E.D.N.Y. 1995) (finding no waiver after three years of litigation, including a motion for a preliminary injunction, an appeal to the Second Circuit of the granting of that motion, a motion for the

disqualification of counsel, a motion for reconsideration of the granting of that request, settlement discussions, and two amended complaints).

Here, plaintiffs asserted their right to arbitration on November 25, 2008, approximately two years after they filed the complaint. During this period, there has been relatively little discovery: each party took only one deposition and exchanged documents. Defendants have not set forth the quantity of documentary discovery, which is their burden as the party opposing arbitration. Therefore, to the extent that the volume of the documentary discovery merits consideration, the court cannot take such prejudice into account when assessing the delay and costs of this litigation.

Moreover, defendants filed the only motion in this action—the current motion. Therefore, they cannot complain of any cost or delay associated with these summary judgment proceedings. *See Thyssen*, 310 F.3d at 105 (citing *Acquaire*, 906 F. Supp. at 830 (finding that in the waiver analysis, the delay associated with motion practice cannot be attributed to the party that did not file the motion, as that party "had no choice but to respond to the motion . . . "). In sum, defendants have not, and, indeed, cannot, set forth sufficient prejudice to surmount the strong presumption favoring arbitration. Therefore, plaintiffs' request for arbitration under Article 9 of the SGHA must be granted.

III.   Conclusion

For the reasons set forth above, defendants' motion for summary judgment is denied. The court finds that the SGHA applies to this action and plaintiffs have not waived their right to arbitration under the SGHA. Accordingly, plaintiffs' request to compel arbitration is granted and this action is stayed pending the outcome of arbitration proceedings.


SO ORDERED.


Dated: Brooklyn, New York
       September 22, 2009

                                             _____/s/_____
                                              DORA L. IRIZARRY
                                              United States District Judge